IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| Plaintiff, : | |
|  : | Case No. 3:08cr030 |
| vs. : | |
|  : | JUDGE WALTER HERBERT RICE |
| HASSAN WASHINGTON, : | |
| Defendant. : | |

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. #13)

Defendant Hassan Washington ("Defendant" or "Washington") is charged in the Indictment (Doc. #2) with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g).  That charge stems from events that occurred after Washington had driven away from Bill Goodman's Gun and Knife Show at Hara Arena on April 22, 2007.  About four miles after leaving that location, officers pulled over the van being driven by the Defendant for an alleged traffic offense.  During the subsequent search of that vehicle, officers discovered the firearm and ammunition which underlie the charge against Washington.  He also made incriminating statements.  As a consequence, the Defendant has filed a Motion to Suppress Evidence (Doc. #13), with which he has requested that the Court suppress the evidence seized from the van and his

statements. On June 24, 2008, this Court conducted an oral and evidentiary hearing on that motion. The parties have filed their post-hearing memoranda (see Doc. ##17 and 18), and this Court now rules on same, beginning its analysis by setting forth the facts it has found from the evidence presented.[1]

On April 22, 2007, Washington attended Bill Goodman's Gun and Knife Show, which was being held at the Hara Arena in Trotwood, Ohio.[2] On that date, Detective Jennifer Godsey ("Godsey") of the Dayton Police Department was working a traffic detail at that location, assisting other officers working at the Show as part of an effort to reduce gun violence.[3] Between 3:00 and 4:00 in the afternoon, Godsey was informed by officers at the Show that they wanted her to make a traffic stop of the vehicle the Defendant was driving away from the event, a red Pontiac Transport.[4] At that time, Godsey's cruiser had been parked at a location called the Red Barn, which is a distance away from the Hara Arena. As a consequence, customers of the Show could not see it when they left that venue.

---

[1]As is discussed below, Defendant's sole argument, in support of his request to suppress the evidence seized from his van and his statements, is that his rights under the Fourth Amendment were violated when the van he was driving was stopped. Consequently, the Court's recitation of the facts and circumstances focuses on the stop of that vehicle.

[2]At Bill Goodman's Gun and Knife Show, a large number of independent vendors set up booths at the Hara Arena, where they buy and sell weapons and related items, such as ammunition, magazines and clothing.

[3]Since the Hara Arena is located in Trotwood, Godsey was working traffic with Sergeant Moeggenberg and Detective Becky Rose of the Trotwood Police Department, who were in a separate cruiser.

[4]According to Godsey, the reason for this request was sketchy, given that a number of officers were on the radio at the same time, requesting the traffic stop of Washington.

In response to the request to make a traffic stop of Washington,[5] Godsey, along with Sergeant Moeggenberg ("Moeggenberg") and Detective Becky Rose ("Rose") of the Trotwood Police Department, who were in a separate cruiser, followed Defendant's vehicle for about four miles. The cruiser being driven by Moeggenberg was the first police vehicle behind Washington for the initial three or four minutes during which the officers followed the Defendant. However, while they were traveling south on North Main Street, near the intersection of that street and Siebenthaler Avenue, given that they had left Trotwood and had entered Dayton, which was Godsey's jurisdiction, Godsey and Moeggenberg switched positions, so that the former was directly behind the Pontiac Transport van. At that point, Godsey was approximately one-half of a car length behind Washington's vehicle. From that location, Godsey observed that there were two occupants of that vehicle and that the windshield wipers were in an upright position.[6] Godsey continued to follow Washington south on North Main Street, until they traveled south of its intersection with Fairview Avenue. At that location, Godsey effected a traffic stop, based upon the fact that, throughout the time that she followed the Pontiac Transport van, the windshield wipers on that vehicle remained in the

---

[5]There is no indication that any officer was aware of the Defendant's identity until after the Pontiac Transport van had been stopped.

[6]Although Godsey described the windshield wipers as being in an upright position, she also indicated that each was at an approximate 45-degree angle, with 90 degrees being perpendicular to the vehicle's hood and zero degrees being parallel with same. Godsey's description of the angle of the windshield wipers is refuted by Defendant's Exhibit 1, a photograph which depicts the wipers as they appeared on April 22, 2007. According to that photograph, the wiper on the passenger's side of the van is at an approximate 50-degree angle, while that on the driver's side appears to be at an angle exceeding 70 degrees.

- 3 -

upright position, which she concluded resulted in the van being in an unsafe condition.

After the traffic stop, Godsey approached the driver's side of the Pontiac Transport van, where she introduced herself to Washington and told him he'd been stopped for having defective windshield wipers on his vehicle. In response to Godsey's request for his driver's license, Washington was not able to produce one, after which she confirmed through her onboard computer that he was not a validly licensed driver.[7] As a consequence, Washington was removed from his van, placed under arrest and secured in the rear of Godsey's cruiser. She then took several photographs of the Pontiac Transport van, including the position of the windshield wipers.[8] Ultimately, that vehicle was searched, with the hand gun and ammunition underlying this prosecution being discovered therein. Godsey issued three traffic citations to the Defendant, one of which was for operating an unsafe motor vehicle due to the upright position of the windshield wipers, in violation of § 4513.02(A) of the Ohio Revised Code,[9] the very reason she indicated that she had stopped Defendant's vehicle. She did not give Defendant a traffic citation for driving a vehicle with inoperable windshield wipers, in violation of § 4513.24(C) of

---

[7]Indeed, Godsey discovered that the Defendant was under several suspensions.

[8]Godsey did not provide these photographs to the Assistant United States Attorney prosecuting this matter.

[9]Although the distance from the Hara Arena to the location of the traffic stop was approximately four miles, with numerous traffic lights, Godsey did not observe Washington commit any moving violation, such as speeding, failing to signal when changing lanes or failing to come to a complete stop at an intersection, during the journey.

- 4 -

the Ohio Revised Code. She also testified that operating a motor vehicle with windshield wipers that do not work is a traffic offense under the law of Ohio.

In his post-hearing memorandum (Doc. #17), Washington argues that the Government violated his rights under the Fourth Amendment, by stopping the Pontiac Transport van in which he was driving.[10] The Government, in contrast, argues that there was no such violation of the Fourth Amendment, because the upright position of the windshield wipers provided Godsey with probable cause to believe that Defendant had violated Ohio Revised Code § 4513.24(C), making it unlawful to drive a motor vehicle with inoperative windshield wipers, and/or § 4513.02(A), making it unlawful to drive a motor vehicle in an unsafe condition.[11] The Court begins its analysis by reviewing the standards it must apply to determine whether the Government has met its burden of demonstrating that the warrantless

---

[10]In his post-hearing submission (Doc. #17), Washington has not challenged the legality of his detention after the traffic stop, his arrest or the search of the Pontiac Transport van. Therefore, this Court has no occasion to address any of those issues.

[11]The Defendant points out that Sixth Circuit authority concerning the legal standard to be employed to determine whether a traffic stop violated the Fourth Amendment is not entirely consistent. See Doc. #17 at 2 (unnumbered). Some decisions indicate that a stop is lawful if officers have probable cause to believe that a traffic offense has been committed, while others have applied the reasonable suspicion standard. Herein, the Defendant takes the position that this Court must apply the reasonable suspicion standard, while the Government, in the main, suggests that the Court apply the more rigorous probable cause standard. See Alabama v. White, 496 U.S. 325, 330 (1990) (indicating that "reasonable suspicion is a less demanding standard than probable cause"). This Court applies the probable cause standard, since it ultimately finds for the Government, thus obviating the need to attempt to unravel the inconsistency in the Sixth Circuit case law. See United States v. Sanders, 476 F.3d 391, 394 (6th Cir. 2007) (acknowledging that "[t]here is a degree of confusion in this circuit over the legal standard governing traffic stops").

seizure of the Defendant, as a result of the traffic stop, was in compliance with the Fourth Amendment.

In <u>United States v. Blair</u>, 524 F.3d 740 (6th Cir. 2008), the Sixth Circuit restated the principles to be applied in determining whether stopping a vehicle for a traffic violation violated a defendant's rights under the Fourth Amendment:

> A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. <u>United States v. Sanford</u>, 476 F.3d 391, 394 (6th Cir. 2007) (quoting <u>Gaddis [v. Redford Twp.</u>, 364 F.3d 763, 771 n. 6 (6th Cir. 2004)). Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. <u>United States v. Jackson</u>, 470 F.3d 299, 306 (6th Cir. 2006) (quoting <u>United States v. Bennett</u>, 905 F.2d 931, 934 (6th Cir. 1990)). When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant. <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996). As we previously have held, "police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." <u>United States v. Mesa</u>, 62 F.3d 159, 162 (6th Cir.1995); <u>see also</u> [<u>United States v.] Hill</u>, 195 F.3d [258, 265 (6th Cir. 1999)] (upholding stop supported by probable cause when officer initially followed vehicle because it was of a type used to transport narcotics).

<u>Id</u>. at 748. It is axiomatic that the Government "bears the burden of demonstrating the reasonableness of a warrantless seizure." <u>United States v. Herrera</u>, 444 F.3d 1238, 1242 (10th Cir. 2006) (ellipses, internal quotation marks and citation omitted).

As indicated above, the Government argues in its post-hearing memorandum (Doc. #18), <u>inter alia</u>, that Godsey had probable cause to believe that Washington was driving the Pontiac Transport van with inoperable windshield wipers, in violation of § 4513.24(C), which provides:[12]

---

[12] The Government argues in the alternative that Godsey had probable cause to believe that Washington had violated 4513.02(A), because the van was unsafe

- 6 -

> (C) The windshield on every motor vehicle, streetcar, and trackless trolley shall be equipped with a device for cleaning rain, snow, or other moisture from the windshield. The device shall be maintained in good working order and so constructed as to be controlled or operated by the operator of the vehicle, streetcar, or trackless trolley.

The Defendant has not responded to the Government's argument in that regard. For reasons which follow, this Court agrees with the Government that Godsey had probable cause to believe that the Defendant had violated § 4513.24(C) at the time she stopped him.[13]

To bolster its premise concerning probable cause, the Government argues in its post-hearing memorandum that events occurring after the traffic stop confirmed and strengthened the existence of probable cause to believe that Washington had violated § 4513.24(C). See Doc. #18 at 8. In particular, the Government relies on Godsey's testimony to the effect that, after she had stopped the van, she asked Defendant to test the windshield wipers. During the test, they remained in the upright position. However, in determining whether probable cause existed, this Court is limited to information in the possession of Godsey when she seized the

---

given the condition of the windshield wipers. Since the Court finds that there was probable cause to believe that the Defendant had violated § 4513.24(C), it is unnecessary to address the Government's alternative argument.

[13]In his post-hearing memorandum (Doc. #17), Defendant has focused exclusively on the issue of whether Godsey had reasonable suspicion to support her belief that the van he was operating was in an unsafe condition, in violation of § 4513.02(A), because of the condition of the windshield wipers. Parenthetically, it is of no consequence that Godsey gave Washington a traffic citation for violating § 4513.02(A), rather than for violating § 4513.24(C). In Whren v. United States, 517 U.S. 806 (1996), the Supreme Court rejected the argument that an officer's subjective motivation was pertinent to the inquiry as to whether a traffic stop violated the Fourth Amendment, focusing instead on the question of whether there was probable cause to believe that there had been a violation of a traffic ordinance, regardless of the officer's subjective motivation for the stop. Accord United States v. Ferguson, 8 F.3d 385 (6th Cir. 1993) (en banc).

Defendant, by executing the traffic stop on his vehicle.  Beck v. Ohio, 379 U.S. 89, 91 (1964) (noting that whether an arrest was "constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense") (emphasis added); Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008) (holding that, when determining whether an arrest was supported by probable cause, "[w]e consider only the information possessed by the arresting officer at the time of the arrest"); Allen v. City of Portland, 73 F.3d 232, 236 (9th Cir. 1996) (stating that, since "[p]robable cause must be determined at the time the arrest is made … [f]acts learned or evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made").  Therefore, in determining whether the stop violated Washington's Fourth Amendment rights, this Court cannot consider Godsey's "after the stop" testimony.  Similarly, the Court cannot consider the testimony of Brenda Askew, Defendant's girlfriend, that the windshield wipers were in working order.

    Nevertheless, this Court concludes that there was probable cause to believe that Washington was violating § 4513.24(C).  Throughout the time that she followed the vehicle he was driving, Godsey was able to observe that the windshield wipers on that van remained constantly in an upright position. Common sense causes this Court to conclude that Godsey's observations demonstrated that the windshield wipers were stuck in an upright position. See United States v. McClain, 444 F.3d 556, 563 (6th Cir. 2005) (noting that a

"flexible, common-sense standard" is applied in determining whether probable cause exists), cert. denied, 127 S.Ct. 580 (2006). This Court concludes that the determination upon observation that the windshield wipers were stuck in an upright position would provide a prudent man (Beck, supra) "a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion" (Blair, 524 F.3d at 478) that the windshield wipers in the Pontiac Transport van were inoperable, which is a violation § 4513.24(C). Given that there existed probable cause to believe that the condition of the van's windshield wipers violated that statutory provision, this Court concludes that the stop of the Defendant did not violate the Fourth Amendment, even though the Officer wrote a citation under § 4513.02(A).

Based upon the foregoing, the Court overrules the Defendant's Motion to Suppress Evidence (Doc. #13).

August 26, 2008

                                      /s/ Walter Herbert Rice
                                  WALTER HERBERT RICE, JUDGE
                                  UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.